also known as Juwan Paiwan Kelsey appellate. Ms. Davis for the appellant, Ms. Bates for the appellate. Good morning, Mary Davis for the appellant, Mr. Kelsey, and I would like to apologize for being late. I got stuck in the line downstairs. So the issue I'd like to address this morning is whether it was error to allow a witness to testify as an expert. Witness without being qualified as an expert witness. It is very clear that the only reason that the government did not want to qualify Ms. Mills as an expert was simply because they did not want any cross-examination occurring regarding the shutdown of the D.C. lab. However, Ms. Mills testimony made it very clear that she was in fact testifying as an expert. She was asked by the government, and this is on page 586 of the joint appendix, she was asked, when you were completing, when you completed your analysis, where did you send those results to? And she replied, once we issued our report, I believe at a later date the data was sent to a private lab. The questioning went on and said, what format was the data in? Ms. Mills replied, it would have been raw data, I believe, for them to reinterpret. And on the same page, that's page 587 of the joint appendix, she was asked whether the raw data is an electropharogram. And the answer was, once they analyze it, it is what you would call an electropharogram. So, and that she used her electropharogram in her testimony for the jury. Now, Mr. Ambrosino was called into the courtroom and explained that Ms. Mills was not intended to be an expert witness, but merely a fact witness. But Mr. Ambrosino also admitted that he did not hear the testimony. He did not know what Ms. Mills was testifying to. But he said that if she was testifying regarding, say, mixture interpretation, or if she was interpreting or analyzing something, that she, in fact, would be testifying as an expert. Judge Walton asked Ms. Mills, well, did your testimony before the jury involve mixture interpretation? And she said that it did. Again, Mr. Ambrosino was not there to hear this testimony. And further, Mr. Ambrosino had mentioned that what Ms. Mills said was merely putting in something, and the machine would spit out something. And that's all that was involved. But the judge asked... Am I correct that the jury knows nothing about this Ambrosino? That's correct. Okay. No, this happened all out of... The jury was not in the courtroom at the time. At the end of all of the direct and cross-examination, Judge Walton asked whether her testimony... Excuse me, I need to look at my notes here. She asked whether her testimony was, in fact, essentially expert testimony. And I think the answer was yes. So the prejudice that Mr. Kelsey claims is that to the extent that there was testimony from Ms. Mills about the comparison or analyzing or looking at the mixture, that counsel should be able to say, well, I don't know. Counsel should have been able to cross-examine her about the dysfunction of the lab. Exactly. And counsel was not so permitted. Is there any other claim of prejudice apart from the lack of an opportunity to cross-examine her? No, it's completely the lack of cross-examination, which had a huge impact on the defense. So as I understand what the government is saying, they intended to put Ms. Mills on to describe her what they termed bench work. And as a factual sort of chain of process, you know, to be able to say, we had the sample, I received the swabs, I did XYZ bench work, and then what I produced was sent to the lab for analysis. That's how they want to use her as a fact witness. Is that right? Well, yes. That's what they wanted to do. And your position, as I understand it, is that she actually did a little more than that, and when she was testifying, she was sort of saying more than she was needed for from the government's perspective. Exactly. So she would refer to, for example, reinterpretation when really all they wanted her for was identifying it as a mixed sample so it could be sent. Exactly. And she did more. And I think what makes it even more problemsome is before she actually testified regarding this case in particular, the government took her through all of her background and her training. Which seemed expert-like. And they in fact asked her, have you been qualified as an expert? And I think she said it like 35 times or so. So all of that was before the jury. And the jury, I don't think they really comprehend the difference between a judge saying, okay, we find you qualified. Now, in terms of what she, when she characterizes her having done some initial interpretation, the Bode Lab never is aware of anything about that, results of that. Or any analysis. They get the sample she sent on. I'm not really clear what Bode Lab did. At one point, Ms. Mills said that they sent her the raw data. But at another point, it sounded like that she sent the report that she did sometime later. The testimony wasn't really clear what was sent. Again, the government's trying to say it was only raw data that was spit out of the machine that was sent. But it's not really clear if that was the case. But you had said that the claim of prejudice is a claim about not being able to cross-examine. Exactly. Exactly. It's not that there is in fact some error in what Ms. Mills did. I don't know. I mean, I don't know where the cross-examination would have gone if trial counsel had been allowed to question Ms. Mills regarding the closure of the lab and what she did and how any of this was impacted. So it's not really clear where it would have gone had the cross-examination. Judge Walden, in the sidebar, was very, very intense, very careful about, A, wanting to restrict Ms. Mills' ability to cross-examine. From witness testimony to fact testimony. And if it was so restricted, he was quite clear in saying that there was no reason to cross-examine about the difficulties of the lab. Yes. He did say that. But at the same time, I believe when Judge Walden was making that determination, that was when he had listened to Mr. Ambrosino say what he had to say. And the testimony of the witness. And so the question, I guess the question for you, to put it in, you know, in the light that I think the prosecution is pressing here, is if everybody was on the same page, that the witness could testify as a fact witness, and if her testimony was only as a fact witness, that there was no room for the cross-examination, that this lab that had had these troubles with interpretation wasn't doing the interpretation. And that what happened then is that there are a few things that Ms. Mills said that sound more like, oh, and there's also some interpretation going on here. And it's your position that those suggestions opened the door for cross-examination and should have allowed the cross-examination. Exactly. And even though there is no evidence that at the time the lab was actually in this period of extra scrutiny and dysfunction, there was no evidence that there was a cross-examination. Excuse me, at the time that Ms. Mills was doing this bench work, this wasn't the time that the lab was in collapse. It was. It was. It was in collapse because of the problems with mixture interpretation. And Ms. Mills said that her testimony to the jury involved mixture interpretation. So that's why it was important to bring out that if her testimony did involve mixture interpretation, that there was room for cross-examination. But if it didn't have to do with mixture interpretation and analysis, and that was the problem with the D.C. lab, then that would have been proper cross-examination. And is your position also that her testimony, that in order for it to be prejudicial to Mr. Kelsey, her testimony or her analysis, her interpretation, not just her bench work, would have had to be known to vote? Would have been? Had to be known to the outside lab? I don't know if it had to be known to the outside lab. Wouldn't it in order for there to be any prejudice? Well, no, because if what she did was incorrect or improper, and that material and whatever she sent was sent on to Bode, and Bode wasn't familiar or didn't know that there was a problem with it, well, it's like a domino. But you're saying not just what she said, but what she did might have been improper. Right. Exactly. Exactly. And because, again, it isn't clear from her testimony if her report was sent out or just the raw data. And then there's some question about the electropharogram, and according to Ms. Mills' testimony, that is not just the raw data. That is something else. And Ms. Mills used her, as she said, her electropharogram in her testimony. And if the court has no further questions, I'll... All right. We'll give you a couple of minutes. Okay, great. Thank you very much. Here, Ms. Mills was called to testify as a fact witness, and to the extent that there is any confusion today about whether she, in fact, testified solely as a fact witness, I think that stems from a misreading or misinterpretation of her testimony. I think that stems from a misunderstanding of the record by appellant. What Ms. Mills testified to was her bench work, was what she participated in, in terms of the physical handling and processing of the DNA evidence, the swabs collected from the sex kit and from the victim. And the last step in that bench work process, as both Hope Parker, the DNA expert from Bodie, and AUSA Ambrosino made clear in his proper, the last step in that bench work process was to identify the DNA evidence. And the last step in that bench work process is after you've extracted the DNA and amplified it and put it into the machine, which is the genetic analyzer, that the genetic analyzer provides raw data, which then is visualized by opening it with a software program that Ms. Mill refers to as a software interpretation or software analysis program. That's GeneMapper, and that is where... Are you saying it in quotes as if it's not an analysis or interpretation? No, but I think I'm using, and I apologize, the hand gestures I think are because what appellant is pointing to in the record is Ms. Mills' testimony where she uses the words or terms analyze or analysis or interpret, and what she is testifying to is the work that is done by the computer, by a machine. By the software program. And so the question is, why don't you just simplify her lives and qualify her as an expert limited to the, you know, identification of this as an example for sending on to the lab. And, you know, it seems to me that it would still have been feasible for you to draw the line you wanted to draw about, you know, she's not doing the interpretation, we're relying on someone else's, and then there would be a clean record about her. Not having sent an interpretation, which, as Ms. Davis points out, you know, if that were her interpretation, then it wouldn't open the door and be a domino. And I have a couple points that I'd like to respond to there. First, when the government called Ms. Mills, the government was not calling her to ask her questions about what work she did that she would refer to as mixture interpretation. Most of that testimony was elicited by appellant on cross-examination, or in the voir dire that was conducted outside of the presence of the jury. And so that was not the purpose for which she was called as a fact witness in this case. And there was a good reason, aside from, you know, not wanting to open the door to issues about cross-examination about what the issue identified at the D.C. Department of Forensic Sciences was. And that's because up to the point of the end of her bench work, where she gets the raw data, which when you open that data using the software program, displays as the electrophorogram, the graph with the peaks and the alleles. Up until that point, that was testimony that was relevant and, you know, basically a chain of custody foundational facts for Ms. Parker's expert testimony. What Shana Mills did after that was irrelevant to the issues in the trial. Because what she did in the lab after that was she looked at the electrophorogram and made a determination about whether there was a major male contributor. For the purpose of uploading a major male contributor, the unknown suspect, profile into the CODIS database. And the government was not seeking to have her testify to the fact that she uploaded a profile into CODIS and that there was a CODIS match. Because that would have been highly prejudicial to appellant and was irrelevant to the issue as it was presented to the jury at trial, which was that Bodie had done the match. And had done that, you know, comparison. And so any confusion here is because during the voir dire and cross-examination, what's being elicited from Ms. Mills is testimony that she wasn't called to testify to on direct. And that is, you know, this separate question of whether she looked at the electrophorogram and made judgments about being able to determine whether there was a major male contributor. So first I would say that it's not error that the judge denied the motion to strike her testimony, because most of that came afterwards and was elicited by appellant or was elicited outside the presence of the jury. So I guess just to simplify my question, even someone whose only role is as the sort of chain of process witness, where the process is as specific as the actions, specialized as this one, wouldn't it have been wise to qualify her as an expert simply for the purpose of being able to locate for the jury, you know, I know what this sample is, I know what this machine does, and when I got a report, I could verify that the machine, you know, had done the familiar thing, that it wasn't printing out someone's Christmas list. I mean, could you qualify as an expert? Perhaps, but I think there's good reason not to, which is that when someone is presented to the jury as an expert witness, their testimony comes with the extra kind of gravitas that an expert comes with. And it is not traditional that the kind of bench work technical components of the DNA process are presented through an expert. It's not traditional that they are? No, there were three other witnesses in this case, as an example. Mr. Curtis, Mr. Fighter from D.C., Department of Forensic Sciences, and Ms. Cooner from Bodie Laboratories, who also testified in this trial as fact witnesses about their bench work, about the roles that they played in the preparation of the samples leading up to the end of the bench work process, which is putting it into the genetic analyzer machine and getting the data out. None of those individuals? Weren't they part of this multilayered analysis? In other words, I thought I remembered that the government was worried, not worried, but thought, well, we'll do a double check just to make sure that before we even send it to Bodie. Is that correct? Is that why you had the three witnesses? I mean, this is not completely contained within the record here, but it is very typical in a forensic DNA case that you would have multiple different technicians or analysts handle things. For example, here, I think the record makes clear that one of the reasons was that when you do the bench work of processing a known sample, either the buccal swab at Bodie from the suspect, Mr. Kelsey, or at DFS, the buccal swab from the victim, you would have a different technician handle the bench work process of those than the person who is doing the bench work on the evidence sample, the sex kit sample. And these are just for internal controls and contamination reasons. So it's very typical to have multiple people who testify as to the bench work here. And one of the reasons is that we didn't have the known sample from Appellant until much later in the process, because at the time Ms. Mills is doing her bench work, there's no suspect, because it's not until after the code is set and other things that we develop that suspect. And so I think one of the point is that to the extent that there were issues that were identified at DCDFS by a panel of experts and a review was conducted, those issues were limited to the bench work. Unfortunately, I think in this record it's also referred to as mixture interpretation, but this is where the words become important in a technical field. They were limited to the process of selecting which loci, so which alleles in a mixture had robust enough DNA data, which loci you were going to select in a mixture, and to apply the statistical analysis, which for a mixture interpretation would be the combined probability of inclusion. So you're saying it's more observation than interpretation? Well, so the issue that was there was really with the statistical analysis, which Ms. Mills could never have been doing, because she testified repeatedly that at the time that DCDFS was handling the DNA evidence in this case, they did not have a suspect profile. So they couldn't have been doing the step that was where the review at DCDFS had implicated some questions about the statistical analysis involving mixtures. And so I think I had misremembered, you agree with opposing counsel that this was during a time when there were issues in the DC lab. In terms of doing that kind of analysis. So I think the timing is a little unclear, because the trial happened much later in time than when Ms. Mills was actually handling and producing that, the lab was producing the raw data. So the time, my reading of this record is that the time at which the benchmark was conducted at DCDFS, and when that raw data was produced, predates the time when there were issues at the lab. But that by the time you're at trial, and this testimony is occurring, the United States Attorney's Office had been routinely making disclosures about what was subsequently identified as an issue with the mixture interpretation statistical analysis. And so had, in this case I believe, made a disclosure that although no statistics were done here by DCDFS, it was our standard policy to make disclosures in cases where there was DNA evidence. And Ms. Davis had a, wasn't clear to her whether any interpretations that Ms. Mills might have done were sent to Bode. And it's my understanding of the record that as Mr. D'Ambrosino was explaining, any report that was forwarded to the lab would have been scrubbed of any interpretation or comparison information. Is that correct? So that is correct, and I point to a couple places in the record that would show that. And that's both AOC Ambrosino's proffers and explanations to the court about how, when you were sending something out to Bode, the entire purpose was to kind of put up this wall where you aren't giving them any of the real interpretation that is done by the individual as opposed to the machine. But also Hope Parker, the DNA expert from Bode, testified that the laboratory work was performed by DCDFS, but that she analyzed it, made, interpreted, and made the comparisons. And that's at page 379 of the deferred appendix. And Ms. Mills made clear that it was the raw data that was sent to Bode for them to pull into their interpretation software or analysis software. And that's at page 587 of the deferred appendix, which I think reinforces this point that what Ms. Mills was testifying to was the bench work up to that last step of getting that data, which is displayed from the computer program as the electrophorogram. And when she was handling these exhibits and trying to match them up, the sole purpose was a chain of custody, a foundational witness, who was saying that we need to do this. We generated data at DCDFS, and that data is what was sent to Bode. And how do I know that what Hope Parker got and received is the same data? It simply was looking at what had appeared on the computer screen, the printout of the electrophorogram at DCDFS, and the way that Bode had taken that was just to write it in a table format, an allele table format, and saying, you know, these appear to be the same. And it was not that she was making any expert opinions or comparisons about whose DNA this was, whether it matched a pellant's DNA, and she certainly didn't testify to any, you know, conclusions about the statistics or, you know, how significant of a match it was, which was all done by Ms. Parker, who was qualified as an expert, and testified without, you know, much cross on these points either. So to the extent that there was any error, which the government maintains there not, it was harmless in this case, because, you know, all of the real expert work was testified to and was subject to cross by Ms. Parker, and had, you know, a pellant tried to open the door to the issue about what else Ms. Mills did, the government would have been able to respond to that by calling these experts, who, as Mr. Ambresino-Proffert and the Court of Appeals say, would have been able to do. But the government accepted, said there were no issues identified in the bench work that was done by DCDFS, which was what was relied on. Before you sit down, Ms. Davis didn't argue this, but I want to ask you about, you both agreed that he was not in custody, Mr. Kelsey, when he was questioned, but it was either extremely fortuitous or he told his lawyer ahead of time that he was going to the police station because his lawyer called. And the detective, we just have his side of the conversation, but she apparently said to him, I want you to stop questioning him, and the detective said, I'll let him decide that. Now, I'll get to my question in a minute, but the lawyer then did what any lawyer would do, short of going down there, called back and said to a client, I want you to leave the station now. My question to you is, what is your advice to police that once a lawyer says, I want you to stop questioning him, that instead of listening to that lawyer, the detective says, I'll let the client decide that? So I think in this case, there certainly was no advice given because there was no involvement of a prosecutor at this stage during which this voluntary interview was happening. I realize that. I'm asking as a prophylactic question. The answer to that question is different. If and when the police were to come to a prosecutor, a lawyer, I think at that point, there are ethical constraints that apply only to the lawyers here about contact with represented parties. And so the advice is different once you involve a lawyer. So looking at this from the perspective of the detective or investigator here, I think that he is within the legal rights of saying there is no standard that a lawyer can invoke on behalf of their client. Some right to remain silent or otherwise that that is a right for the client to invoke and that if the individual is there in a non-custodial interview, that that is permissible. So I think the question is difficult because if and when a detective were to come to us and say, I am sitting here with someone who informs me that they have a lawyer and are represented, our advice would be different. But that is because at that point, we have ethical constraints. So you have an obligation as a lawyer, an ethical obligation, not to talk to a represented party without counsel present. And not to ask someone on our behalf to do that. Exactly. Whereas you're saying the investigators have no such obligation, even when they know someone's represented and the counsel for that person believes it's not in his or her client's interest to speak, that it still is the independent decision of the client whether to do that. That is, yes. And an appellant has certainly not cited any case law to the contrary. And I'm not aware of any. And from reading a video in the phone conversation, I think what was happening there is the lawyer was trying to advise her client to leave or decline to answer questions. But that that is, again, a decision to be made by her client, Mr. Kelsey, appellant here. And that watching this video, certainly it didn't cross the line into a situation where it was not voluntary. As the investigator made clear repeatedly that he was free to leave. And if he wished to leave, he could walk out the open door. Mr. Kelsey, I think, was there instead, as the district court found, because he wanted to put out his alternate story. When she told him to leave, he still stayed there for another two or three minutes. If you watch the video, he says to his lawyer, I'm leaving now, hangs up the phone and immediately turns back to one of the two at that time, investigators in the room, and picks up the line of conversation that they had been in. So he certainly displays no interest in leaving. And at one time during the earlier phone call, references, you know, I'm here to help. She wants me to leave, but I'm here. I know what I'm doing. Thank you. Unless there are any further questions, we ask that the judgment be affirmed. All right. Ms. Bates, why don't you take two minutes? Okay, thank you. Briefly in response to your question, Judge Henderson, regarding the statement. I believe it was very clear to the officer, the investigator, that Mr. Kelsey was in fact represented by counsel. And counsel advised the investigator that she did not want Mr. Kelsey answering any more questions. Now, it may well be that Mr. Kelsey thought he was going to get himself out of the hole or whatever. But the point is that, number one, the investigator knew from counsel that Mr. Kelsey was represented. And number two, that she did not want him to be questioned any further. And in addition, Mr. Kelsey is not, I don't know how to say this, but Mr. Kelsey is not a highly intelligent person. I think he's perhaps borderline intellectually disabled. And so I think, again, this isn't something that was really part of the record at that point in time. But I don't think that there can be a bright-line rule that the prosecutor has to be involved and tell the investigator to not do any further questioning. Getting back to the other argument regarding the DNA, at the very end, the judge asked this in front of the jury, just one question, when you say you've got a mixture and you've made a determination as to whether it's coming from two different sources, is it machine or are you making that determination? And Ms. Mills testified in front of the jury, I am doing that interpretation. And I think what is so important here is that the government said, it's not a problem, we can qualify her. We'll go ahead and qualify her. And then as soon as Judge Walton says, okay, I'm going to allow this cross-examination, then there's this whole two-hour hiatus where Mr. Ambrosino comes in, there's argument back and forth. It is clear the only reason that this person was not qualified as an expert was because the government wanted to foreclose the cross-examination. But at the same time, Ms. Mills testified as to certain facts that were, in fact, expert testimony and not just simply factual testimony. And since the government has the burden to prove that the error did not have an effect on the jury, I don't think they carried that burden, and we believe that the conviction should be reversed. All right, Ms. Davis, you were appointed to represent your client, and you've done your usual excellent job. Thank you. Okay, thank you.
judges: Henderson, Pillard, Ginsburg